MISSION PETROLEUM CARRIERS,
INC., Petitioner,

v.

Roy B. SOLOMON, Respondent.

No. 01–0292.

Supreme Court of Texas.

Argued Jan. 30, 2002.

Decided May 15, 2003.

Cliff Harrison, Andrew McCord Gilchrist, Harrison, Bettis & Staff, L.L.P., David M. Gunn, Beck Redden & Secrest, L.L.P., Roger Townsend, Russell S. Post, Hogan Dubose & Townsend, L.L.P., Houston, William Powers, Jr., The University of Texas School of Law, Austin, for petitioner.

Joe Greer, Douglas Paul Greer, Greer & Greer, Tommy L. Yeates, Moore Landrey Garth Jones Burmeister & Hulett, Beaumont, Julie A. Ford, Bell Turney Coogan & Richards, LLP, Austin, for respondent.

Justice JEFFERSON delivered the opinion of the Court with respect to Parts I, II, III–C, IV & V, joined by Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice O'NEILL, and Justice WAINWRIGHT, and an opinion with respect to Parts III–A, III–B & III–D, joined by Justice HECHT, Justice OWEN, and Justice WAINWRIGHT.

Mission Petroleum Carriers, Inc. terminated Roy Solomon, an at-will employee, for failing a random drug test. Solomon sued Mission, contending that it breached a common-law duty by not exercising ordinary care in the manner it collected his urine specimen for testing. Mission claims that this lawsuit is essentially a suit for negligent discharge, which is incompatible with the doctrine of employment-at-will. We granted review because the case presents important questions about whether to impose liability on employers in light of the comprehensive regulation of drug testing outlined in the United States Department of Transportation regulations.

Answering a question we left open in *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 351 (Tex.1995), the court of appeals held that an employer owes a duty to an at-will employee to conduct a drug test with reasonable care. 37 S.W.3d 482, 488. The court of appeals was not writing on a clean slate. A comprehensive set of federal rules and regulations governs collecting and processing urine for drug testing—a scheme that is designed both to require the employer to observe collection protocols and to place tools at the employee's disposal for invalidating false-positive test results. Because the regulations adopted by Congress adequately balance these interests, we decline to impose a common-law duty on employers who conduct in-house urine specimen collection pursuant to Department of Transportation (DOT) regulations. Accordingly, we reverse the court of appeals' judgment and render judgment that Solomon take nothing.

## I

## Background[1]

Mission required its 520 truck drivers to submit to random drug testing pursuant

1. Where the evidence is disputed, we accept (as the jury presumably did) the account of-

to DOT regulations. *See* 49 C.F.R. §§ 40.1–.39, 382.305 (1996).[2] As authorized by these regulations, Mission used its own employees to collect the drivers' urine samples for testing by outside laboratories. On April 3, 1997, Roy Solomon, an at-will truck driver at Mission's Beaumont terminal, was randomly selected to provide a urine sample for drug testing. When Solomon arrived for the test, his immediate supervisor, terminal manager Ed Hillebrandt, gave Solomon an unsealed collection container that had been sitting exposed on a desk in the terminal dispatcher's office. Solomon went unaccompanied into an adjacent restroom to provide the specimen. Solomon returned to the dispatcher's office and set the collection container on the table. He then went back to the restroom to wash his hands, leaving the container behind.

When he returned from the restroom approximately one minute later, Hillebrandt divided the sample into two separate containers. Solomon then sealed each container, initialed the tamper-proof seals, and placed the containers in a plastic bag. Solomon signed an informed consent form confirming the "identity and integrity of [the] sample throughout the collection and testing process." Mission sent one of the containers to Bayshore Clinical Laboratories in Brown Deer, Wisconsin for analysis; the other was set aside in the event further testing was required. The Bayshore Laboratory analyzed the specimen and discovered THC metabolite, a chemical produced by the human body after marijuana use.

A Medical Review Officer (MRO),[3] charged with ensuring the accuracy of the test results, informed Solomon that he had tested positive for THC metabolite. 49 C.F.R. § 40.33. Solomon told the MRO that the positive result could not possibly be accurate because he had never used marijuana. Solomon denied taking medication or any other product that might have caused the THC metabolite to appear in his sample. He did not, however, suggest that the results might have been compromised by Mission's faulty collection procedures. Following his discussion with the MRO, Solomon called Mission and requested a retest. Mission sent the second sample to a different laboratory for analysis. On April 9, 1997, when the second test also confirmed the presence of THC metabolite, Mission terminated Solomon's employment.

The next day, Solomon applied for truck-driving positions at Coastal Transport and MCX Trucking. The DOT regulations require a prospective employer to review the applicant's test results from previous employers for the preceding two years from the date of the application. 49 C.F.R. § 382.405(f), .413(a)(1), (d) (1996). Consequently, as part of each employment application, Coastal Transport and MCX Trucking asked Solomon to sign a consent form authorizing Mission to release those drug test results. Mission reported Solomon's test results to Coastal and MCX after Solomon consented to the disclosure. *See id.* § 382.405(f); *see also* 62 Fed.Reg. 16380 (1997) (employers may only release test results with the informed written consent of the employee). Neither Coastal

fered by Solomon.

**2.** Unless otherwise specified, all references in this opinion are to the version of the regulations in effect when the events at issue took place.

**3.** A MRO is "a person who is a licensed physician and who is responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and evaluating medical explanations for certain drug test results." 49 C.F.R. § 40.3 (2003).

Transport nor MCX Trucking hired Solomon.

Eighty-four days after the urine test, Solomon passed an independent laboratory's hair-follicle test, which was designed to detect marijuana consumption. Although there is evidence that hair follicle testing is a scientifically recognized procedure, the test purports only to reveal the persistent use of marijuana over time, not isolated uses. Solomon concedes that the hair-follicle test would establish at most that he was not a regular user of marijuana, but could not confirm or refute that he smoked marijuana around the time Mission collected his urine sample.

Solomon sued Mission, first alleging only defamation but later adding claims for business disparagement and negligence. The trial court granted Mission's motion for summary judgment on the defamation and disparagement claims, and Solomon has not challenged that judgment on appeal. The negligence claim proceeded to trial. Solomon testified that he had never smoked marijuana. He also presented evidence that Mission violated each of the following collection protocols, which are designed to ensure the validity of the drug test result:

(1) DOT regulations prohibit an employee=s immediate supervisor from collecting the employee=s urine sample unless it is impractical for any other individual to perform the collection. 49 C.F.R. § 40.23(d)(3). Here, however, Solomon's immediate supervisor collected the specimen, and Solomon presented evidence that non-supervising employees could easily have performed that task.

(2) Both the employee and the collector must be present when the collection container is removed from a sealed collection kit. *Id.* § 40.23(b)(1). In this case, however, the container had been removed from the collection kit before Solomon arrived to provide his specimen.

(3) The collector must tell the employee to wash his hands before providing the sample and not again until after the sample is returned. *Id.* § 40.25(f)(5), (11). Hillebrandt did not give Solomon this admonition.

(4) The collector is required to restrict access to the collection site. *Id.* § 40.25(b). Mission's collection site, however, was unrestricted.

(5) The collection container must be kept in view of the collector and the employee between the time the employee has urinated and the time the specimen is sealed. *Id.* § 40.25(f)(17). But Solomon was separated from the container for at least 60 seconds while he washed his hands.

Solomon argued that Mission's failure to follow these DOT protocols resulted in "false positive" test results. He presented evidence that the test results were the catalyst for a series of adverse consequences, culminating in his inability to find employment as a truck driver. He sought damages for mental anguish and lost wages.

The jury found that Mission's negligence proximately caused Solomon's injuries and awarded Solomon past and future damages for medical care, loss of earning capacity, and mental anguish totaling $802,444.22. The jury also assessed $100,000 in exemplary damages on a finding that Mission acted with malice. The trial court rendered judgment on the verdict.

The court of appeals affirmed, holding that Mission owed its employees a duty of care when collecting urine samples for drug testing. 37 S.W.3d at 488. It also

held that the evidence was legally and factually sufficient to support the jury's finding that Mission's failure to follow DOT testing protocols proximately caused THC metabolite to be present in Solomon's urine sample. *Id.* The court concluded that Mission's conduct, coupled with Solomon's resulting loss of earning capacity, supported the recovery of mental anguish damages. *Id.* at 489. Finally, the court upheld the punitive damages award, concluding that there was clear and convincing evidence that Mission disregarded an extreme risk of serious harm. *Id.*

We granted Mission's petition for review to decide whether an employer owes its employees a duty of care when collecting urine samples for drug testing pursuant to DOT regulations. 45 Tex. Sup.Ct. J. 15 (Oct. 13, 2001).

## II

### The Parties' Contentions

#### A. Mission's Arguments

Mission presents four principal issues. First, Mission argues that there is no duty of care owed by an employer in its decision to fire an at-will employee. It asserts that the court of appeals has effectively created a new cause of action in Texas for negligent termination. Mission contends that this holding jeopardizes the employment-at-will doctrine, which generally permits an employer to terminate an at-will employee for a good reason, a bad reason, or no reason at all. *See City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex.2000). Second, Mission argues Solomon presented no evidence that its mishandling of the urine sample caused Solomon to receive a positive drug test result. Third, Mission asserts that the court of appeals' holding

regarding Solomon's mental anguish damages conflicts with *Boyles v. Kerr,* 855 S.W.2d 593, 597 (Tex.1993), in which we rejected the tort of negligent infliction of emotional distress. Finally, Mission contends there is no evidence of malice to support the jury's punitive damages award.

#### B. Solomon's Arguments

Solomon disputes that the employment-at-will doctrine is implicated in this case. He observes that the jury was charged on a broad-form negligence question, not on particular theories of negligent investigation or negligent evaluation. His primary complaint is not that he was wrongfully terminated, but that Mission's negligent collection procedures destroyed his prospects for future employment as a truck driver. Solomon contends that recognizing a common law duty to use reasonable care in collecting urine samples satisfies the *Greater Houston Transportation Co. v. Phillips* risk/utility test because an employee's need for protection from a flawed drug-test result outweighs the magnitude of the burden of guarding against this injury. 801 S.W.2d 523, 525 (Tex.1990) (noting that when considering whether there is a basis for imposing a duty, courts consider "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant").[4]

On the issue of causation, Solomon argues that he produced sufficient direct and circumstantial evidence for the jury to find: (1) he never used marijuana; (2) Mission's negligence rendered the sample

---

4. Solomon concedes that this is not a voluntary assumption of duty case because the urine collection was not performed gratu-

itously or for consideration and was not intended to protect or benefit Solomon. *See* RESTATEMENT (SECOND) OF TORTS § 323.

scientifically invalid; and (3) the laboratories performing the tests did not contaminate the sample. From these facts, Solomon contends that the jury could reasonably infer that Mission's negligence proximately caused a "false positive" test result and that he presented legally sufficient evidence to support the trial court's mental anguish and exemplary damages awards.

## III

### A. *SmithKline Beecham*

■■■ To prevail on his negligence claim, Solomon must show that (1) Mission owed him a duty, (2) Mission breached its duty, (3) Mission's breach proximately caused his injuries, and (4) damages resulted from this breach. *See Thapar v. Zezulka,* 994 S.W.2d 635, 637 (Tex.1999). Because duty is the threshold issue, we begin by addressing whether an employer owes a duty to an at-will employee to use reasonable care when collecting an employee's urine sample for drug testing pursuant to DOT regulations. The existence of a duty is a question of law. *SmithKline Beecham Corp.,* 903 S.W.2d at 351. When considering whether there is a basis for imposing a duty, we consider various factors, "including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Phillips,* 801 S.W.2d at 525. With these factors in mind, we consider whether Solomon has presented a basis for imposing a common-law duty of reasonable care on

employers when conducting in-house urine specimen collection pursuant to DOT regulations.

In *SmithKline Beecham Corp. v. Doe,* this Court addressed the related question of whether an independent drug testing laboratory, hired by an employer to test prospective employees, owes a duty to warn those employees that certain substances, if ingested prior to a drug test, could cause a positive test result. 903 S.W.2d at 351. Emphasizing that we were deciding only the narrow question presented, we concluded that the testing laboratory owed no duty to warn the person tested or to investigate the reason for a positive result. *Id.* at 354. We declined to address any duty the employer may owe to an employee and expressly reserved the question whether a laboratory may be liable for performing drug tests negligently. *Id.* at 351. *Cf. Willis v. Roche Biomedical Labs., Inc.,* 61 F.3d 313, 315–16 (5th Cir. 1995) (predicting that Texas courts would hold, based on *SmithKline,* that drug testing laboratories owe no duty of care to their clients' employees).

### B. The Law in Other Jurisdictions

Courts in other jurisdictions are split on whether a testing laboratory owes a duty to third-party employees when collecting or analyzing urine samples.[5] Courts in New York, Illinois, and Wyoming have utilized risk/utility balancing tests, applying many of the factors we articulated in *Phillips,* to hold that laboratories obtaining specimens as part of an employer's substance abuse testing program owe a duty of care to employees submitting specimens.[6] On the other hand, courts in Texas

---

5. *See* L. Camille Hebert, 1 EMPL. PRIVACY LAW § 4:32 (2002) (analyzing the differing conclusions reached by courts in deciding whether employers and laboratories owe a duty to test subjects).

6. *See, e.g., Santiago v. Greyhound Lines, Inc.,* 956 F.Supp. 144, 152–53 (N.D.N.Y.1997) ("[F]or a physician's office engaged in the business of collecting urine specimens from transportation workers for the purpose of drug screens, it is reasonably foreseeable that

and Ohio reject a laboratory's duty of care, emphasizing generally that drug-testing companies have a direct relationship only with the employer and not the employee.[7] Courts in Louisiana and Pennsylvania are divided.[8] Each of these cases, however, involves third-party collection of urine for drug testing, an issue not before this Court. We must answer, then, whether an employer owes a duty of care when the employer itself collects the employees' urine samples.

We are not aware of any cases recognizing the duty that Solomon advocates here. In fact, we have located only one case directly addressing what duty an employer owes when the employer itself collects employees' urine samples. In *Bellinger v. Weight Watchers Gourmet Food Co.*, 142 Ohio App.3d 708, 756 N.E.2d 1251, 1257 (2001), an employer terminated an employee for failing a random drug test. The employee claimed that his employer breached a duty to perform the drug test in a competent manner because it failed to follow the company's drug and alcohol policy. *Id.* at 1256. The court, however, disagreed. It held that because the plaintiff was an at-will employee, his employer was entitled to discharge him whether or not he was subject to a drug test; therefore, the employer did not owe the employee a duty to perform the test in a competent

---

negligence contributing to a false positive could injure an employee."); *Stinson v. Physicians Immediate Care, Ltd.*, 269 Ill.App.3d 659, 207 Ill.Dec. 96, 646 N.E.2d 930, 934 (1995) (the employee=s termination was foreseeable, injury was likely, and "[t]he drug-testing laboratory is in the best position to guard against the injury, as it is solely responsible for the performance of the testing and the quality control procedures."); *Duncan v. Afton, Inc.*, 991 P.2d 739, 745 (Wyo.1999) ("[A] company contracting with an employer to collect and handle specimens for employee alcohol testing ... is aware that the likely effect of a false positive result is significant and devastating; employment will likely be terminated and future prospects of employment adversely impacted.").

**7.** *See, e.g., Frank v. Delta Airlines, Inc.*, No. CIV. A.3–00–CV–2772–R, 2001 WL 910386, at *2–*5 (N.D.Tex. Aug. 3, 2001); *Hall v. United Labs, Inc.*, 31 F.Supp.2d 1039, 1043 (N.D.Ohio 1998); *Willis*, 61 F.3d at 316; *cf. O'Connor v. SmithKline Bio–Science Labs., Inc.*, 36 Mass.App.Ct. 360, 631 N.E.2d 1018 (1994) (employer's negligence regarding chain of custody did not result in harm employee complained of); *Bird v. W.C.W.*, 868 S.W.2d 767, 770 (Tex.1994) (holding that a mental health professional had no physician-patient relationship with her patient's father and therefore owed no duty to the father not to negligently misdiagnose the condition of the child). *But see Ishikawa v. Delta Air Lines*, 149 F.Supp.2d 1246 (D.Or.2001) (anal-

ogizing drug-test subjects to third-party beneficiaries of a contract to infer a special relationship and thus a duty of care).

**8.** *Compare Elliott v. Lab. Specialists, Inc.*, 588 So.2d 175, 176 (La.Ct.App.1991) (holding that an employee who was terminated for failing a drug test could assert a negligence claim against the testing laboratory), *and Lewis v. Aluminum Co. of Am.*, 588 So.2d 167, 170 (La.Ct.App.1991) (holding that an at-will employee had a cause of action against a drug testing laboratory when the laboratory negligently conducted the employee's drug test), *with Herbert v. Placid Ref. Co.*, 564 So.2d 371, 374 (La.Ct.App.1990) (holding that a drug testing laboratory owes no duty of care to test subjects because its relationship is with the employer not the employee); *compare also Sharpe v. St. Luke's Hosp.*, —— Pa. ——, 821 A.2d 1215, 1221 (2003) (holding that a hospital that contracts with an employer to collect samples for drug testing owes a duty of care to the employee undergoing the test), *with Hammond v. City of Philadelphia*, 164 F.Supp.2d 481, 483 (E.D.Pa.2001) (holding that laboratory owes no duty of care to an employee when it performs drug screening tests on behalf of the employer), *Ney v. Axelrod*, 723 A.2d 719, 722 (Pa.Super.Ct.1999) (holding that drug testing laboratory did not owe a prospective employee a duty of care), *and Caputo v. Compuchem Labs, Inc.*, No. CIV. A.92–6123, 1994 WL 100084, at *8–*9 (E.D.Pa. Feb. 23, 1994) (holding that drug testing laboratory owed no duty to employee).

manner. *Id.* at 1257.[9]

Other courts have similarly refused to impose a common-law tort duty requiring an employer's agent to comply with DOT protocol when the agent collects samples for drug testing. In *Carroll III v. Federal Express Corp.*, 113 F.3d 163, 167 (9th Cir. 1997), an outside drug-test administrator for Federal Express allegedly violated several DOT collection protocols and chain-of-custody requirements when collecting the employee's urine sample, resulting in a "false positive" test result. The plaintiff argued that Federal Express's drug-testing policy created an implied obligation that he would not be terminated except for a positive drug test "that was untainted by error." *Id.* The court, however, rejected the plaintiff's invitation to recognize an implied obligation to ensure error-free testing. *Id.*

Similarly, in *Graham v. Contract Transportation, Inc.*, 220 F.3d 910, 912 (8th Cir. 2000), the Eighth Circuit held that an employee did not have a claim against his employer when he was terminated for failing a drug test administered by an outside testing center that did not comply with DOT regulations. The court reasoned that the employee's claim of a faulty drug test was, at most, a negligent-discharge claim and thus not actionable under Iowa law. *Id.* at 912–13.

Other courts have refused to hold employers liable for discharging at-will employees based on negligently conducted polygraph tests. *See, e.g., Johnson v. Delchamps, Inc.*, 897 F.2d 808, 811 (5th Cir. 1990); *Hall v. United Parcel Serv. of Am., Inc.*, 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273, 277–78 (1990). In finding Delchamps not liable, the Fifth Circuit noted

that the at-will doctrine affords employers broad discretion in making personnel decisions. *Delchamps*, 897 F.2d at 811. The court reasoned that, because an employer can terminate an employee for no reason, it has no obligation to ascertain whether a termination was based on correct information after a reasonable investigation. *Id.*

The New York Court of Appeals in *Hall* refused to recognize a cause of action based on allegations that an employee's polygraph test, which was negligently administered, resulted in an innocent employee's termination for theft. *Hall*, 556 N.Y.S.2d 21, 555 N.E.2d at 278. The court deferred to state and federal legislative initiatives as the more appropriate avenue for addressing legitimate concerns about the consequences of an employer's use of questionable test results. *Id.* at 277–78. Moreover, the court noted that the Federal Employee Polygraph Protection Act of 1988, 29 U.S.C. § 2001, which creates a private cause of action for certain violations of the Act, greatly diminished the need to recognize a new common-law tort remedy for negligently conducted polygraph tests. *Id.*

Although these opinions inform our consideration of the issue, they rest largely on analysis of wrongful termination claims. We recognize that Solomon does not contest Mission's right to terminate him. Instead, he asserts that Mission had a duty not to destroy his future employment prospects. We must consider, then, whether imposing that duty is consistent with the comprehensive federal regulatory scheme already in place and with our common law in related areas.

---

9. We recognize that *Bellinger* involved a claim of wrongful discharge rather than negligent interference with future employment. But the underlying theory in both cases is that the employer's negligence in collecting specimens for drug testing caused the employee's damages.

## C. Federal Regulations Provide Avenues for Employees' Redress

 Congress has not given employees a private cause of action under the DOT regulations at issue here. *See Parry v. Mohawk Motors of Mich., Inc.,* 236 F.3d 299, 308 (6th Cir.2000); *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170–71 (2d Cir. 1998); *Schmeling v. NORDAM,* 97 F.3d 1336, 1343–44 (10th Cir.1996); *Abate v. S. Pac. Transp. Co.,* 928 F.2d 167, 169–70 (5th Cir.1991). Nevertheless, like the Polygraph Protection Act, the DOT regulations impose stringent rules for administering and disclosing drug test results and levy civil penalties for violation of these rules. *Compare* 29 U.S.C. § 2005 (violations of Polygraph Protection Act punishable by civil penalties, injunctions, and private actions for damages), *with* 49 C.F.R. § 382.507, and 49 U.S.C. § 521(b) (violations of DOT regulations punishable by DOT fines, loss of insurance, or levy of an unsatisfactory safety rating).

In addition, employees have significant avenues of redress when employers fail or refuse to follow DOT protocol in collecting urine samples. Under the DOT regulations, for example, employers cannot require employees to sign consent or release forms with respect to any part of the drug testing, including collection, when the employer fails to follow statutory requisites for collecting the specimen. *See* 62 Fed. Reg. 16380 (1997). When employers do not follow DOT protocol, employees can refuse to initial the seal on the specimen bottle and can refuse to sign the Federal Drug Testing Custody and Control Form. *See id.* Without this form, the Medical Review Officer (MRO) cannot verify the drug test. *See* 49 C.F.R. § 40.33(a), (c).

The regulations anticipate that positive test results do not necessarily confirm that the employee is guilty of drug use. *Id.* § 40.33(a) ("[a] positive test result does not automatically identify an employee/applicant as having used drugs in violation of a DOT agency regulation."). For that reason, the DOT regulations require not only that an independent MRO review the test results, but also provide the MRO with the authority to examine the procedures by which the sample was collected, including interviewing the employee to determine if positive results can be explained by factors other than drug use. *Id.* § 40.33; *see also S. Calif. Gas Co. v. Util. Workers Union of Am.,* 265 F.3d 787, 790 (9th Cir.2001).

The MRO must review "the chain of custody to ensure that it is complete and sufficient on its face" before certifying a positive drug test result. 49 C.F.R. § 40.33(a). The MRO is prohibited from verifying positive results that are not obtained or processed in accordance with quality assurance and control protocols. *Id.* § 40.33(b)(3). And, before verifying a positive test result, the MRO must give the employee an opportunity to contend that the result is positive for a legitimate reason. *See id.* § 40.33(c); *see also S. Calif. Gas Co.,* 265 F.3d at 790. If an employee chooses not to initial or sign the seal or Custody and Control Form, the MRO cannot confirm the chain of custody and must contact the employee to discuss the positive result. 49 C.F.R. § 40.33(a), (c). And even if the chain of custody is confirmed, the MRO cannot verify a positive test result if aware that the urine sample was not obtained in accordance with the DOT protocols. *Id.* § 40.33(b). These protections reduce the risk of harm and likelihood of injury to an employee whose employer negligently collects urine samples for drug testing. Solomon did not attempt to utilize these avenues of redress.

On the day Solomon was first employed, Mission gave him explicit guidelines not only implementing but also supplementing the DOT regulations. Under these guide-

lines, Solomon could have requested that the positive test result be reported by the MRO as negative:

> It is the responsibility of the MRO to make the final determination of a positive test result. If the report he receives indicates a positive drug test for one or more of the drugs tested, the MRO will examine possible alternatives, which may have resulted in this positive finding. He has the authority to check medical records and interview a driver to determine if a positive report has a justifiable reason.... After talking to the driver or reviewing his medical records, it is possible that the test result will be reported as negative to the employer.

> If your test result is positive, and there are no mitigating circumstances, the MRO will attempt to talk to you directly.

Solomon did not avail himself of these protections. Instead, he (1) signed the Custody and Control Form (which certified that Mission complied with DOT regulations pertaining to the integrity of the sample) and (2) did not disclose to the MRO Mission's alleged malfeasance during the collection process. If Solomon had complained to the MRO about Mission's testing techniques, the MRO could have investigated and negated Solomon's positive test result. As it stood, however, nothing on the face of the sample would have suggested to the MRO that the chain of custody was breached; indeed, Solomon himself certified that the chain of custody was unbroken. *See* 49 C.F.R. § 40.33(a).

Solomon also could have complained and initiated administrative proceedings challenging Mission's specimen-collection regimen. *See* §§ 386.12, 386.1; *see also* 62 Fed.Reg. 16376 (1997). An Associate Administrator for the Federal Highway Administration is charged with investigating alleged violations of the regulations and determining if employers have complied with the statutory requirements. 49 C.F.R. §§ 386.1, 386.21. Upon finding violations, the Associate Administrator has the authority to compel compliance, assess civil penalties, or both. *Id.* § 386.1.

Accordingly, had Solomon filed a complaint, Mission could have been fined up to $10,000, lost its ability to obtain insurance, or received an unsatisfactory safety rating. *See id.* § 382.507; *see also* 49 U.S.C. § 521(b). Once given an "unsatisfactory rating," a motor carrier is prohibited from transporting hazardous materials and is ineligible for certain federal contracts. *See* 49 C.F.R. § 385.13. The DOT regulations also give the Associate Administrator authority to fashion relief to the complainant and "assure that the complainant is not subject to harassment, intimidation, disciplinary action, discrimination, or financial loss" for having filed the complaint. 49 C.F.R. § 386.12; *see also Rector v. LabOne, Inc.,* 208 F.Supp.2d 987, 996 (E.D.Ark.2002) (holding that this scheme provides an adequate remedy to an employee when his employer does not follow drug testing procedures). Because employees can thereby protect themselves from harm, we have less incentive to create a duty requiring employers to exercise ordinary care in collecting employees' specimens for drug testing.

Solomon sued in court rather than pursuing these administrative remedies. We recognize that curtailing drug use in trucking is, as the regulations indicate, a national concern requiring national standards. *See* 49 C.F.R. § 391.81. But we are not persuaded that case-by-case adjudication of collection procedures through tort litigation would serve the broader interest Solomon quite properly seeks to protect.

■ Applying the *Phillips* risk/utility factors here, we agree there is a serious

risk that an employee can be harmed by a false positive drug test. However, the risk is reduced by the protection DOT regulations afford to the employees. As we have seen, the DOT's comprehensive statutory and regulatory scheme, coupled with the authority granted to the MRO, affords significant protection to employees who are the subject of random drug tests. Without these protections, the risk of harm resulting from a negligently conducted urinalysis test would be great. But here, the DOT regulations strike an appropriate balance between the need for efficient drug testing and the requirement that each employee have the means to insist on the integrity of the process. While the regulations do not create a private cause of action for an employer's breach of DOT protocols, employees are entitled to compel compliance by invoking regulations already in place. Those regulations serve both as an incentive for employers to carefully abide by those protocols and as a safe harbor for employees whose test results are tainted by unacceptable breaches of collection procedures. We therefore decline to impose a common-law duty on employers who conduct in-house urine specimen collection under the DOT regulations.

### D. Employment–At–Will

■ We must also balance any risk to employees against the burden it could place on our employment-at-will doctrine. In Texas, an employer generally can terminate an at-will employee for any reason or no reason at all. *City of Midland*, 18 S.W.3d at 216. We recently refused to limit the scope of the doctrine by declining to recognize a cause of action for negligent investigation of an at-will employee's alleged misconduct. *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 606 (Tex.2002). Solomon attempts to distinguish this case from a negligent discharge or a negligent investigation cause of action.

He argues that the negligent act in question was the mechanical function of urine collection conducted by Mission's safety department, not a personnel decision to determine Solomon's employment status. He contends that the urine collection process was implemented to ensure safe roadways and not to determine an employee's employment status. *See* 49 C.F.R. § 391.81.

We agree that the employment-at-will doctrine is not directly implicated here because Solomon has not sued for wrongful discharge. But we must consider his claim in its overall context. Because Solomon's complaint concerns the process by which Mission chose to terminate him, it goes to the core of at-will employment. *See Theisen v. Covenant Med. Ctr.*, 636 N.W.2d 74, 82 (Iowa 2001); *see also Graham*, 220 F.3d at 912 (holding that employee's claim of improperly conducted drug test was at most a negligent discharge case). The exception Solomon advocates here could quickly swallow the rule. *See Theisen*, 636 N.W.2d at 82; *Sears*, 84 S.W.3d at 609; *SmithKline Beecham Corp.*, 903 S.W.2d at 353–54.

■ The court of appeals based its decision to impose a duty in part on the fact that Mission's negligently conducted test caused Solomon damages beyond mere termination of his employment. 37 S.W.3d at 487 (citing *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991)). The court of appeals reasoned that because the DOT regulations require each new employer to inquire about any prior positive drug test results and compelled Solomon to consent to their disclosure before assuming a safety sensitive position, Solomon was effectively denied a career as a truck driver. *Id.* at 487–88. The court of appeals failed to acknowledge, however, that any process used to discover employee misconduct or

to evaluate employee effort is, in effect, an "investigation." Background checks, co-worker interviews, electronic surveillance, finger or voice print analysis, expense-report audits, and performance reviews are all "investigations," conducted by employers, that may result in job termination. It is not difficult to characterize an erroneous performance report, which is often based on hearsay, as the product of a negligent investigation. *See Garcia v. Allen*, 28 S.W.3d 587, 591 (Tex.App.-Corpus Christi 2000, pet. denied). Yet an employer is "at liberty to discharge [an employee] ... for a reason based on incorrect information, even if that information [is] carelessly gathered." *Delchamps*, 897 F.2d at 811.

■ If a duty of care were to arise every time the harm to an employee transcends the employment agreement, the employment-at-will doctrine would be undermined because an employer's basis for termination would have to be justified by a reasonable investigation, which is contrary to the doctrine. *See Sears*, 84 S.W.3d at 609 (noting that "the employment-at-will doctrine does not require an employer to be reasonable, or even careful, in making its termination decisions. If the at-will doctrine allows an employer to discharge an employee for bad reasons without liability, surely an employer should not incur liability when its reasons for discharge are carelessly formed."). Just as we have consistently preserved the doctrine of employment-at-will from encroachment by other liability theories, we decline Solomon's invitation to adopt a new theory of liability for negligent drug testing. *See, e.g., Sears*, 84 S.W.3d at 606 (declining to recognize a duty to investigate before terminating an at-will employee); *City of Midland*, 18 S.W.3d at 216 (declining to recognize a duty of good faith and fair dealing in the employer-employee relationship); *Winters v. Houston Chroni-*

*cle Publ'g Co.*, 795 S.W.2d 723, 724–25 (Tex.1990) (declining to recognize a common-law whistleblower cause of action).

## IV

We need not address the court of appeals' second basis for imposing a duty of care: the general duty to act with ordinary care assumed when one's voluntary actions create a danger to others. 37 S.W.3d at 488 (citing *Buchanan v. Rose*, 138 Tex. 390, 159 S.W.2d 109, 110 (1942)). Solomon concedes that the elements of a voluntary undertaking cause of action have not been satisfied. In addition, we do not reach the *Boyles v. Kerr* and malice issues because our other holdings in this decision are dispositive. 855 S.W.2d at 597. Because Solomon failed to establish that Mission owed him a duty of care, and his other claims are not preserved in this Court, we do not reach the remaining causation, damages, and malice questions. TEX. R.APP. P. 47.1.

## V

### Conclusion

We reverse the court of appeals' judgment and render judgment that Solomon take nothing.

Justice ENOCH filed a concurring opinion, joined by Chief Justice PHILLIPS and Justice O'NEILL.

Justice SCHNEIDER filed a concurring opinion.

Justice SMITH concurred in the judgment only.

Justice ENOCH filed a concurring opinion, joined by Chief Justice PHILLIPS, and Justice O'NEILL.

Roy Solomon asserts that he will never be able to work in his chosen career again because his employer, Mission Petroleum

Carriers, Inc., negligently conducted a drug test. Although Mission Petroleum tries to engage our interest by responding that the well-settled employment-at-will doctrine in Texas is under attack, Solomon insists, and the Court agrees, that the employment-at-will doctrine is not at issue here. Solomon, though he perhaps wishes an employer could not fire an employee for a reason that is false, is not concerned with his termination. His injury, if in fact negligently caused, is much more serious. According to Solomon, a positive result on a drug test for a professional truck driver stays with his record the rest of his life. Thus, I think it unnecessary for the Court to nevertheless discuss the employment-at-will doctrine, suggesting that that would somehow be regrettably circumscribed were we to impose common-law liability on an employer who conveys false information that results in its former employee being unemployable in his chosen career.

Having said this, I agree with the Court's discussion about the federal mandate for drug testing, and I concur with its judgment. Congress has mandated drug testing, and the United States Department of Transportation has adopted regulations governing the circumstances here. Any superimposing by us of common-law liability on an employer who conducts drug testing in these circumstances would alter the delicate balance the federal government has tried to achieve. Thus, we should not do so. For these reasons, I join Parts I, II, III–C, IV, and V of Justice Jefferson's opinion. Consequently, those parts constitute the opinion of the Court.

Justice SCHNEIDER, concurring.

The Court's refusal to impose a common-law duty is premised on its reluctance to interfere with the DOT's "comprehensive" regulatory scheme and "burden ... our employment-at-will doctrine." 106 S.W.3d at 717. Justice Enoch's concurring opinion points out that the employment-at-will doctrine is not implicated in this case, and I agree with that reasoning. But I would add that I do not believe that imposing a common-law duty would disrupt the balance in the policies underlying the DOT regulations.

In effect, the majority's reasoning suggests that the federal statute preempts any state common-law duty of care. The Court reaches this conclusion without entering into any of the usual preemption analysis. I disagree with this conclusion-I believe common-law recovery could co-exist with the federal scheme without disrupting it. I would instead hold that Solomon's claim of negligence fails because he did not produce any evidence of causation.

Solomon alleges Mission failed to follow a number of the steps outlined in the DOT protocol. Specifically, Solomon complains of Mission's collection of the urine sample by his immediate supervisor rather than a non-supervising employee, removal of the container from the collection kit prior to Solomon's arrival for testing, failure to have Solomon wash his hands before providing the sample, failure to restrict access to the collection site, failure to maintain blue water in the toilet, failure to turn off all external water sources, and failure to keep the collection container in view while Solomon washed his hands after providing the sample. Yet, Solomon never produced evidence to show a causal link between these failures and the false-positive test result.

When reviewing a "no evidence" point, we must view the evidence in a light that tends to support the finding of a disputed fact and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001); *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992). A jury's finding will be upheld if the evidence supporting it "rises to a level that

would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994).

To establish causation, Solomon was required to show that Mission's negligence proximately caused his urine sample to test positive for marijuana metabolite. Though he presented several theories on this issue, Solomon did not present any evidence to make these theories anything more than guesses.

Solomon's expert witness testified that marijuana metabolite, the substance detected in Solomon's urine sample, is a substance produced by the human body that does not derive directly from the marijuana itself. Solomon speculates that the urine sample could have been contaminated with marijuana metabolite from another source. He alternatively asserts the unsealed test kit could have been contaminated before he arrived at the office. Solomon even hypothesizes that his supervisor could have switched urine samples while Solomon left the room to wash his hands. However, Solomon failed to present any evidence to substantiate these theories. Nor did he attempt to raise *res ipsa loquitur* as the basis for a finding of negligence.

Solomon did not offer any probative evidence to show that any of the steps Mission failed to follow caused the appearance of the marijuana metabolite in his urine sample. We cannot "convert mere suspicion or surmise into some evidence." *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). I would therefore reverse the court of appeals judgment because Solomon failed to show a causal link between Mission's acts and the appearance of marijuana metabolite in Solomon's urine sample.