**Opinion issued December 14, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-23-00097-CV**

**NO. 01-23-00102-CV**

**NO. 01-23-00103-CV**

**NO. 01-23-00392-CV**

**NO. 01-23-00393-CV**

———————————

**IN RE LUMINANT GENERATION COMPANY LLC, NRG TEXAS POWER LLC, CALPINE CORP., EXGEN HANDLEY POWER, LLC N/K/A CONSTELLATION HANDLEY POWER LLC, ET AL., Relators**

---

**Original Proceeding on Petition for Writ of Mandamus**

---

**O P I N I O N**

The underlying multidistrict litigation ("MDL") arises from Winter Storm Uri that hit Texas in February 2021 and the resulting outages of electricity that crippled much of the state. Hundreds of retail electricity customers sued hundreds

of entities involved in the electricity market in Texas—including natural gas providers, power generators and co-generators (collectively "wholesale power generators"),[1] transmission utilities, public power companies, retail electric providers, and the Electric Reliability Council of Texas ("ERCOT")—for damages sustained due to the loss of electrical power.[2]

This mandamus proceeding concerns the retail customers' claims against the wholesale power generators for negligence, gross negligence, and negligent undertaking, and their assertions of nuisance. The wholesale power generators, the relators, argue that the claims brought by the retail customers, the real parties in interest, have no basis in law or fact and that the pretrial MDL court, the respondent, abused its discretion by denying their Rule 91a motions to dismiss these claims.

We agree and conditionally grant mandamus relief.

**Background**

In February 2021, Winter Storm Uri hit Texas. It swept bone chilling Arctic air and frigid precipitation across the state. For nearly a week, temperatures

---

[1] Power generators, including co-generators, generate electricity that is intended to be sold at wholesale. *See* TEX. UTIL. CODE § 31.002(10). A separate "retail electric provider" then sells the electricity to retail customers in this state. *Id.* § 31.002(17).

[2] The Supreme Court of Texas recently held that ERCOT is protected from suit by sovereign immunity. *See CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 621, 629 (Tex. 2023).

plunged to record lows—with many areas experiencing prolonged temperatures in the teens, and even below zero. For many Texans, the extreme cold was accompanied by heavy accumulations of snow and ice. It has been noted that Winter Storm Uri was "catastrophic" and "may have been the most severe winter weather event in the recorded history of Texas." *See CPS Energy v. Elec. Reliability Council of Tex.*, 671 SW.3d 605, 612 (Tex. 2023); *see also Luminant Energy Co. v. Pub. Util. Comm'n of Tex.*, 665 S.W.3d 166, 174 (Tex. App.—Austin 2023, pet. granted).

The prolonged and extreme cold temperatures along with the heavy snow and ice led to an unprecedented demand for electricity and resulting power blackouts across the state. *CPS Energy*, 671 SW.3d at 612; *Luminant*, 665 S.W.3d at 173–76. It has been estimated that approximately 4.5 million households and businesses lost electrical power for days at a time during some of the coldest days ever recorded in the state's history. *See Luminant*, 665 S.W.3d at 175. This litigation followed.

As noted above, hundreds of retail customers across Texas sued hundreds of entities involved in the Texas electricity market for damages sustained due to the resulting electrical outages. The MDL Panel established a pretrial MDL court to

streamline the various lawsuits.[3] The pretrial MDL court ordered the parties to select five bellwether suits to proceed first with dispositive motions and discovery.

The five bellwether suits that were chosen have dozens of retail customers as plaintiffs and hundreds of defendants, including over 200 wholesale power generators.[4] With respect to the wholesale power generators, the retail customers alleged negligence, gross negligence, negligent undertaking, nuisance, tortious interference with contract, civil conspiracy, concert of action, and indivisible injury against them.[5]

The wholesale power generators filed motions to dismiss under Rule 91a.[6] *See* TEX. R. CIV. P. 91a. After conducting a two-day hearing, the pretrial MDL

---

[3] TEX. R. JUD. ADMIN 13. The MDL panel selected the Honorable Sylvia A. Matthews to serve as the pretrial judge.

[4] The five bellwether suits, which were transferred into the MDL court for pretrial proceedings, Master Cause Number 2021-41903, include: *Randy Turner, Individually and as Personal Representative of the Estate of Terrill Turner a/k/a Terrell Turner, Deceased, et al v. NRG Texas Power, et ux*, cause no. 2021-24797, pending in the 164th District Court of Harris County; *Bernadine Edwards, Individually, as Next of Kin of Lauralene Butler Jackson, Deceased, and as Wrongful Death Beneficiary v. ERCOT, Inc. et al*, cause no. 2021-84438, pending in the 281st District Court of Harris County; *Ernest Peterman, Individually and on Behalf of the Estate of Ella Peterman v. ERCOT et al*, cause no. 2021-18532, pending in the 164th District Court of Harris County; *Valerie Daniels v. Centerpoint Energy, Inc. et al*, cause no. 2021-18513, pending in the 215th District Court of Harris County; and *All America Ins. Co. et al v. ERCOT et al*, cause no. 2022-13706, pending in the 281st District Court of Harris County.

[5] All of the bellwether suits asserted nuisance except *All America Insurance*.

[6] After the retail customers amended their pleadings, the wholesale power generators filed amended Rule 91a motions. *See* TEX. R. CIV. P. 91a. These are the live pleadings governing this mandamus proceeding.

4

court signed orders granting in part and denying in part the Rule 91a motions. Without elaboration, the pretrial MDL court dismissed the causes of action against the wholesale power generators for tortious interference with contract, civil conspiracy, concert of action, and indivisible injury—and allowed the claims and assertions for negligence, gross negligence, negligent undertaking, and nuisance to proceed.

The wholesale power generators in the five bellwether suits now seek mandamus relief from the denial in part of their Rule 91a motions.[7] *See* TEX. R. JUD. ADMIN. 13.9(b) (authorizing review by court of appeals of order or judgment from MDL pretrial court).

## Standard of Review

Mandamus relief is appropriate when a trial court abuses its discretion in denying a Rule 91a motion to dismiss. *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 266 (Tex. 2021) (orig. proceeding). A trial court abuses its discretion when it fails to correctly analyze or apply the law. *In re Cerberus Cap. Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding). "A trial court has no

---

[7] Three of the five mandamus petitions were filed in this Court (Nos. 01-23-00097-CV, 01-23-00102-CV, and 01-23-00103-CV). The other two were filed with our sister court and then transferred to our Court, to promote judicial efficiency, under our Local Rule 2 (Nos. 01-23-00392-CV, 01-23-00393-CV). *See* 1st TEX. APP. (Houston) LOC. R. 2 (permitting transfer of cases between First and Fourteenth Court of Appeals in MDL). Because all five mandamus petitions are nearly identical, we address them together in this opinion. *Id.*

5

discretion in determining what the law is or applying the law to the facts, even when the law is unsettled." *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).  Mandamus relief will issue only when the moving party has no adequate remedy by appeal. *See In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding).

Rule 91a allows a party to move for early dismissal of a cause of action on the ground that it has "no basis in law or fact." *See Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 654 (Tex. 2020) (quoting TEX. R. CIV. P. 91a.1).  A cause of action has no basis in law if the allegations, taken as true, together with any inferences reasonably drawn from them, do not entitle the claimant to the relief sought. *Id*. A cause of action has no basis in fact if no reasonable person could believe the facts as pleaded. *Id*.

We review a trial court's decision on a Rule 91a motion de novo. *See id*. This is so because the availability of a remedy under the facts alleged is a question of law and the rule's factual-plausibility standard is akin to a legal sufficiency review. *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016).

In conducting our review, we cannot consider any evidence. *See In re First Reserve Mgmt., L.P.*, 671 S.W.3d 653, 659 (Tex. 2023) (orig. proceeding).  Rather, we must make our determination based solely on the substance of the Rule 91a

motion, the plaintiff's live pleadings, and any pleading exhibits permitted by Rule 59. *See id.* at 660.

**Negligence**

The retail electricity customers alleged that the wholesale power generators had continuing duties to: (1) weatherize and maintain their facilities and equipment to prevent the loss of electrical power; (2) assure that they had adequately trained staff to prevent the loss of electrical power; (3) provide reserve electricity to the ERCOT power grid; (4) provide electricity to the ERCOT power grid; and (5) supply electricity to the ERCOT power grid to assure its reliability.

Taken together and construed liberally, as we must, the retail customers principally allege that the wholesale power generators had an overarching duty to continuously supply electricity to the power grid, and thus to all retail customers. They further assert that preceding and during Winter Storm Uri, the wholesale power generators breached that duty in various ways that can be summarized as follows: (1) failing to winterize and maintain its equipment; (2) failing to supply electricity to the ERCOT power grid by not securing adequate fuel supply and reserve energy; (3) failing to properly supervise and train workers to ensure against generator outages that occurred during Winter Storm Uri; (4) failing to ensure that their facilities and equipment would be exempted from ordered blackouts by filing appropriate forms and/or taking other necessary or reasonable actions; and

7

(5) failing to avoid more widespread power blackouts by enrolling in ERCOT's emergency load-shedding program, which caused the retail customers to lose electricity when ERCOT activated the program.

This asserted duty forms the basis of the retail customers' cause of action for negligence against the wholesale power generators, including their assertion of negligent nuisance.[8]  It is therefore the beginning point, and crux, of our analysis.

## A.    Legal Duty

"The threshold inquiry in a negligence case is duty." *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 145 (Tex. 2022) (quoting *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)).  This is a "question of law for the court to decide from the facts surrounding the occurrence in question." *Id*. at 144–45 (quoting *Phillips*, 801 S.W.2d at 525).  This inquiry encompasses several questions of law; namely, the existence, scope, and elements of such a duty. *Id*. Here, the initial controlling question before us is whether the wholesale power generators owed a duty to the retail customers to continuously supply them with electricity under the factual allegations presented. *See id*.

---

[8]     "[T]he term 'nuisance' refers not to a cause of action . . . but to the legal injury . . . that gives rise to the cause of action." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 604 (Tex. 2016).  "[A] claim [for negligent nuisance] is governed by ordinary negligence principles.  The elements the plaintiff must prove are 'the existence of a legal duty, a breach of that duty, and damages proximately causes by the breach.'" *Id.* at 607.

8

"A duty is 'a legally enforceable obligation to conform to a particular standard of conduct'" and can be assumed by contract or imposed by law. *Helbing v. Hunt*, 402 S.W.3d 699, 702 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *see, e.g.*, *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803–04 (Tex. 1999). Here, the retail customers do not allege any duty imposed by contract.[9] Consequently, we must determine whether the retail customers pleaded a recognized legal duty owed to them by the wholesale power generators to continuously supply electricity.

To determine whether a defendant owes a particular legal duty to a claimant, a court must first ascertain whether the law has recognized such a duty under the same or similar circumstances. *Elephant Ins.*, 644 S.W.3d at 144–45 (explaining that duty inquiry involves evaluating factual situation presented "in the broader context of similarly situated actors" (quoting *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017)). For example, if a special relationship exists between the parties under a statute or legal precedent that gives rise to a legal duty, that duty exists in the case presented as a matter of law and "the duty analysis ends there." *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 292 (Tex. 1996); *see Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33–34 (Tex. 2002)

---

[9] The wholesale power generators had bilateral contracts with purchasers of wholesale energy, including the retail electric providers, but not with any retail customers.

9

(recognizing that relationship between parties is factor to consider in determining whether duty exists). That, however, is not the case here. The retail customers also did not plead any facts to support the existence of any special relationship with the wholesale power generators. *See, e.g.*, *Wakefield v. Bank of Am., N.A.*, No. 14-16-00580-CV, 2018 WL 456721, at *5 (Tex. App.—Houston [14th Dist.] Jan. 18, 2018, no pet.) (mem. op.).

### 1. *Existing Legal Duty*

For much of the Twentieth Century, electric utilities in Texas were authorized by law to operate as tightly regulated, vertically integrated monopolies. *See Luminant*, 665 S.W.3d at 170. In any given geographic area of Texas, just a single, vertically integrated electric utility was authorized to provide electricity to every retail customer in the area. *Id.*

Under that regime, being vertically integrated meant that an electric utility controlled every principal component of how electricity actually reached each retail customer in its area—(1) the generation of electrical power; (2) the transmission of that electrical power on high-voltage lines over long distances; and (3) the distribution of electricity over shorter distances to the ultimate retail customer. *Id.* at 171; *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n of Tex.*, 507 S.W.3d 706, 708–09 (Tex. 2017).

All of that changed on January 1, 2002. That is when Texas implemented a new, fully-competitive retail market for electricity.[10] Under this new regime, every retail customer chooses its own provider of electricity and the rates are set by competition rather than by regulation. TEX. UTIL. CODE § 31.002(4); *see Luminant*, 665 S.W.3d at 171; *Oncor Elec. Delivery*, 507 S.W.3d at 711–12. This meant that every vertically integrated electric utility had to "unbundle" into three separate units: (1) a power generation company that generates electricity to be sold at wholesale; (2) a retail electric provider; and (3) a transmission and distribution utility that actually provides electricity to the retail customers. *See* TEX. UTIL. CODE § 39.051(b); *see also id*. § 31.002(10), (17), (19).

The end-result is that wholesale power generators are no longer public electric utilities. *See id*. §§ 11.004(1), 31.002(2), (5). Wholesale power generators do not, and cannot, own or operate the transmission and distribution facilities that carry electricity to the retail customers. *See id*. § 31.002(10). They also do not, and cannot, enter into agreements with retail customers to sell them electricity. *See id*. § 31.002(6)(C), (16)–(17).

Instead, wholesale power generators solely produce "electricity that is intended to be sold at wholesale" to retail electric providers, who in turn sell the

---

[10]    *See* TEX. UTIL. CODE § 39.001(b)(1) ("The legislature finds that it is in the public interest to: implement on January 1, 2002, a competitive retail electric market that allows each retail customer to choose the customer's provider of electricity and that encourages full and fair competition among all providers of electricity.").

electricity directly to retail customers. *See id*. § 31.002(10)(A), (17). The electricity enters a sprawling electrical grid managed and operated by ERCOT,[11] and then transmission utilities distribute the electricity to retail customers. *See id*. § 31.002(19).

Importantly for our analysis here, wholesale power generators are now statutorily precluded by the Legislature from having any direct relationship with retail customers of electricity. *See, e.g.*, *id*. §§ 31.002(10), (16), (17), 39.051. Under this statutory framework, wholesale power generators can have no legal relationship with retail customers as a matter of law. *See id*.; *see also Hous. Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 588 (Tex. 2023) (noting that petitioners had no direct relationship with employee in finding no duty); *Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. App.—Tyler 2006, no pet.) (holding no duty as matter of law owed to plaintiff because plaintiff was not customer and had no relationship to bank).

Indeed, we are not aware of any controlling Texas authority under this current statutory scheme, and the retail customers have cited none, that holds a wholesale power generator owes a legal duty to continuously supply electricity to

---

[11]  This self-contained grid covers approximately 70 percent of the State of Texas geographically and serves nearly 90 percent of the state's electricity customers. *See Luminant Energy Co. v. Pub. Util. Comm'n of Tex*., 665 S.W.3d 166, 171–72 (Tex. App.—Austin 2023, pet. granted).

the grid and thus ultimately to retail customers—who must contract with retail electric providers to purchase their electricity.

Instead, the retail customers rely upon *In re Centerpoint Energy Houston Electric, LLC*, 629 S.W.3d 149, 161–63 (Tex. 2021), *Cura-Cruz v. Centerpoint Energy Houston Electric LLC*, 522 S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2017, pet. denied), and *Bearden v. Lyntegar Electric Co-op., Inc.*, 454 S.W.2d 885, 887 (Tex. App.—Amarillo 1970, no writ), for the proposition that wholesale power generators have a common law duty to provide reliable electricity. But these cases are distinguishable for several reasons.

First, *Bearden* was decided pre-deregulation. Since 2001, ERCOT is the entity that has the statutory responsibility "to ensure the reliability and adequacy" of the Texas power grid. *See CPS Energy*, 671 S.W.3d at 611; *see also* TEX. UTIL. CODE § 39.151. Second, none of these cases hold that a wholesale power generator under the current statutory regime has a duty to continuously supply electricity to the grid and thus to retail customers.

The retail customers also contend that our Legislature has codified common law duties owed to them by the wholesale power generators. Relying on sections 186.001 and 186.002 of the Utilities Code, the retail customers maintain that a wholesale power generator is a "public utility" and, as such, owe them a duty "to maintain continuous and adequate service at all times." *See* TEX. UTIL. CODE

13

§§ 186.001–.002. Significantly, these statutory provisions were enacted pre-deregulation. *See* Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, sec. 186.001–.002, 1999 Tex. Gen. Laws 998, 999 (codified at TEX. UTIL CODE §§ 186.001–.002). Section 186.001 defines a "*public utility*" as a "private corporation that does business in this state and *has the right of eminent domain . . .* engaged in the business of generating, transmitting, or distributing electric energy to the public." TEX. UTIL. CODE § 186.001 (emphasis added).

Section 186.002(b) then provides that "[a] *public utility* is dedicated to public service [and] [t]he primary duty of a public utility . . . is to maintain continuous and adequate service at all times to protect the safety and health of the public against the danger inherent in the interruption of service." *Id.* § 186.002(b); *see also id.* §§ 11.004 (defining "*public utility*" or "*utility*" to mean an "*electric utility*" as defined in section 31.002 (emphasis added)).

But the more recently enacted provisions in section 31.002 of the Utilities Code, that are part of the current statutory framework, state that the term "*electric utility*" "does not include . . . a power generation company." TEX. UTIL. CODE § 31.002(6) (emphasis added) (Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 11, sec. 31.002, 1999 Tex. Gen. Laws 2547, 2548). To the extent that these statutes conflict, the most recently enacted statute prevails. *See* TEX. GOV'T CODE § 311.025 ("[I]f statutes enacted at the same or different sessions of the legislature

14

are irreconcilable, the statute latest in date of enactment prevails."). Here, the most recently enacted and prevailing statute is section 31.002 of the Utilities Code.

Even if sections 186.001 and 186.002 of the Utilities Code could be applicable here, they still would not support the retail customers' argument. This is because we are not aware of any Texas authority, and the retail customers have cited none, that currently gives the wholesale power generators the power of eminent domain—which is necessary to trigger these statutes. *See* TEX. UTIL. CODE §§ 186.001–.002.

In rewriting the electricity market in Texas, the Legislature could have codified the retail customers' asserted duty of continuous electricity on the part of wholesale power generators into law. But it chose not to do so. And we may not impose our own judicial meaning on these statutes by adding words and creating relationships and duties that are not contained in the plain language of the statutes. *See Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). Indeed, "judicial policy preferences should play no role in statutory interpretation." *See McLane Champions, LLV v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 918 (Tex. 2023).

Accordingly, based on the current state of our jurisprudence in Texas and the plain language of the controlling deregulatory statutes, we conclude that Texas does not currently recognize a legal duty owed by wholesale power generators to

retail customers to provide continuous electricity to the electric grid, and ultimately to the retail customers, under the allegations pleaded here by the retail customers. We must therefore determine whether, under the MDL pretrial court's orders, Texas caselaw should recognize this duty.

### 2. *Creation of a New Legal Duty*

The retail customers maintain that even if the Legislature and Texas courts have not recognized a duty owed by wholesale power generators to provide continuous electricity to the electric grid, and thus ultimately to them, that their pleadings are sufficient to establish such a duty. "When a duty has not [already] been recognized in particular circumstances, the question [for the Court] is whether one should be." *Elephant Ins.*, 644 S.W.3d at 145 (quoting *Pagayon*, 536 S.W.3d at 506).

Our supreme court has instructed that courts must weigh what are often referred to as the "*Phillips* factors" in determining whether a duty exists and what it is. *See id.* at 149. Specifically, we must weigh "the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.'" *Id.* (citing *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004)). We may also consider whether one party had

superior knowledge of the risk or right to control the actor who caused the harm. *Id*.

In determining whether to impose a duty in a defined class of cases, we do not determine whether the facts show a breach of an applicable standard of care. *Id*. at 145. Instead, the duty inquiry involves evaluating the factual situation presented "in the broader context of similarly situated actors." *Id*. In this context, "[c]ourts may not hold people to very general duties of exercising ordinary care in all circumstances." *Id*. Rather, Texas law requires courts to be specific in determining the existence, scope, and elements of any new legal duties. *Id.* (quoting *Pagayon*, 536 S.W.3d at 506).

Here, under the facts alleged, the relevant risk of injury is that multiple wholesale power generators cannot provide electricity to the ERCOT power grid, potentially leaving retail customers without electricity. We note that wholesale power generators have some control over whether they can generate electricity by how they maintain their equipment. *See Luminant*, 665 S.W.3d at 170 (noting that "generation and consumption must at all times be maintained in near-perfect balance" or "else a total grid collapse"). And the Legislature has given ERCOT oversight and enforcement authority to ensure a reliable and safe electrical grid and that electricity production is accurately accounted for among the generators. *See* TEX. UTIL. CODE § 39.151(a)–(j).

But, even if the wholesale power generators had perfect maintenance and complete control over their production of electricity, the retail customers' pleadings acknowledge that it is "ERCOT [who also] manages the delivery of that electricity" and that "ERCOT's function is 'power dispatch,' or the scheduling and managing of how electricity will flow through the network." Thus, as the retail customers have pleaded, and the current statutory framework makes clear, wholesale power generators have no actual control over the electricity they produce once it leaves their generation facility. *See Luminant*, 665 S.W.3d at 170 (noting that "constraints on transmission can result in grid congestion, and power generated in one geographic region may not be available to consumers in another").

The retail customers have also pleaded that the wholesale power generators send electricity to the ERCOT power grid and then transmission utilities transport the electricity, which ultimately results in delivery to the retail customers. And, in the event of load-shed orders, "transmission owners then decide where to cut power and how to rotate outages."[12] Thus, the retail customers have also acknowledged that the wholesale power generators neither have control over how

---

[12] A load-shed event occurs when ERCOT "directs operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid." *RWE Renewables Americas, LLC v. Pub. Util. Comm'n of Tex.*, 669 S.W.3d 566, 570–71 (Tex. App.—Austin 2023, pet. granted); *see also* TEX. UTIL. CODE § 38.076.

18

transmission utilities distribute electricity, nor control over ERCOT—which "monitors the flow of energy from more than 680 generation units to more than 26 million customers over more than 46,500 miles of transmission lines, all while balancing generation with load to maintain a system frequency of 60 Hertz." *Luminant*, 665 S.W.3d at 172; *City of San Antonio v. Pub. Util. Comm'n of Tex.*, 506 S.W.3d 630, 635 (Tex. App.—El Paso 2016, no pet.).

Moreover, the retail customers could not plead that they have any direct relationship with the wholesale power generators in purchasing electricity— because the Legislature has precluded any such relationship as a matter of law. *See* TEX. UTIL. CODE §§ 31.002(10), (16), (17), 39.051; *see also Mendez*, 671 S.W.3d at 588 (noting that petitioners had no direct relationship with employee in finding no duty); *Peavy*, 89 S.W.3d at 33–34 (recognizing that relationship between parties is factor to consider in determining whether duty exists).

In conducting this duty analysis, foreseeability is a dominant consideration. *See Phillips*, 801 S.W.2d at 525. But foreseeability alone is not enough to create a duty. *City of Waco v. Kirwan*, 298 S.W.3d 618, 624 (Tex. 2009). "Foreseeability does not necessarily equate to predictability." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019). "Rather, 'foreseeability' means that the actor should have reasonably anticipated the dangers that his negligent conduct created for others." *Id.*

19

Although foreseeability of the "general danger" is a key part of the inquiry, we must also evaluate the foreseeability of the specific danger at hand—namely, "whether the injury to the particular plaintiff or one similarly situated could be anticipated." *Elephant Ins.*, 644 S.W.3d at 149 (quoting *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018)). But "foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby defendant's conduct brings about the injury." *Id.* at 150 (quoting *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.3d 472, 478 (Tex. 1995)).

Here, the wholesale power generators did not dispute below that not providing continuous electricity could foreseeably cause harm, and we acknowledge that multiple wholesale power generators being unable to produce electricity during a winter storm or otherwise would foreseeably result in a general danger to retail customers. But, just as the wholesale power generators could foresee extreme weather impacting their ability to generate electricity, retail customers were also in as good a position to contemporaneously assess their physical safety and economic interests and to act. *See Elephant Ins.*, 644 S.W.3d at 150.

In that regard, the retail customers' pleadings mention previous weather events that resulted in the loss of electricity, such as a 1989 cold weather event, a 2011 winter storm, and the 2014 polar vortex. Accordingly, just as the wholesale

power generators could foresee that extreme weather could limit their production of electricity, the retail customers could also foresee from these previous extreme-weather events that they could experience outages. *See Elephant Ins.*, 644 S.W.3d 144–45. This is not uncommon in Texas during an extreme-weather event. Thus, the risks associated with extreme weather in our state and losing electricity was, and is, equally foreseeable to the retail customers.

We may also consider the existing statutory regulatory framework in the *Phillips*-factor analysis. *See, e.g.*, *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 714–15 (Tex. 2003) (declining to impose duty after "[a]pplying the *Phillips* risk/utility factors" because, in part, "comprehensive statutory and regulatory scheme" reduces risk of harm). The retail customers acknowledge that the Legislature created a comprehensive statutory framework to oversee and manage the Texas electrical market, which went into effect in 2002. *See* TEX. UTIL. CODE § 39.001.

As described above, this framework delegates oversight to creating a reliable and safe electrical grid to ERCOT. *See id.* § 39.151(a). ERCOT has authority from the Public Utility Commission ("PUC")[13] to "adopt and enforce rules relating to the reliability of the regional electrical network." *See id.* § 39.151(d). Market participants, including the wholesale power generators in these proceedings, "are

---

[13]     *See* TEX. UTIL. CODE §§ 12.001 et seq.

21

statutorily required to abide by all rules and procedures established by [ERCOT], and their failure to do so could result in a penalty." *CPS Energy*, 671 S.W.3d at 616–17. It is the Legislature's prerogative to create this statutory framework, which may not completely eliminate the risk from electrical-grid outages, but it meaningfully reduces the risk of harm. *See, e.g.*, *Mission Petroleum*, 106 S.W.3d at 714–15 (declining to impose duty after "[a]pplying the *Phillips* risk/utility factors" because, in part, "comprehensive statutory and regulatory scheme" reduces risk of harm).

We next weigh the aforementioned factors against the social utility of the wholesale power generators' conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant. *See Elephant Ins.*, 644 S.W.3d at 145.

The social utility of the wholesale power generators in the state is indisputably of great benefit. Retail customers and commercial and industrial businesses depend upon having reliable electricity, especially during extreme weather. The burden of guarding against the injury that retail customers experience by not having electricity during extreme weather is not entirely clear.

But the retail customers list several burdens that they believe the wholesale power generators would need to undertake, such as weatherizing equipment, adequately staffing generation facilities during extreme weather, and verifying

22

adequate fuel to power generators, among others.  After Winter Storm Uri, the Texas Legislature sought to address these same concerns by passing legislation that requires weatherization of wholesale power generators' assets and giving ERCOT authority to inspect for compliance. *See CPS Energy*, 671 S.W.3d at 628; *see, e.g.*, TEX. UTIL. CODE § 35.0021 (providing that PUC will require each power generation company to prepare generation assets to provide adequate electric generation service during weather emergency).  And, in doing so, the Legislature did not create any new or corresponding duties on wholesale power generators owed to retail customers. *See* TEX. UTIL. CODE § 35.0021.

We also must consider the consequences and burden of placing the new duty urged by the retail customers on the wholesale power generators.  If we created a new duty for wholesale power generators to supply continuous electricity to the grid, and ultimately to the retail customers, we would upend the carefully-crafted framework that the Legislature has implemented.  And legislative silence on this new asserted duty does not give us the power to legislate from the bench. *See Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 432 (Tex. 2023); *see also* TEX. CONST. art. II, § 1 (dividing powers of state government among "three distinct departments" and providing that their respective powers are mutually exclusive).

23

In any event, the wholesale power generators cannot produce electricity in a continuous manner but only when electricity is needed. *See Luminant*, 665 S.W.3d at 170 (noting that "most electricity generation must occur concurrently with consumption"). Moreover, the supply of electricity must be "maintained in near-perfect balance at an equilibrium point of 60 Hertz" or the electric grid may fail or cause damage to grid equipment. *Id.* Accordingly, the new duty that the retail customers assert for wholesale power generators, providing continuous electricity, is essentially unworkable from a practical and statutory standpoint.[14]

Finally, if we created a new duty for wholesale power generators to supply continuous electricity to retail customers, the potential burden of liability of wholesale power generators to every retail customer would be statewide. Considering that extreme weather is a normal occurrence in Texas, such a duty would likely have significant consequences by increasing the price of electricity as well as discouraging long-term investment in wholesale power generators in Texas.

In sum, and as referenced above, we believe that imposing any such new duty on wholesale power generators is more appropriate for the Legislature, "which is accountable to the people through the political process,"[15] and who can

---

[14] Indeed, different generators rely on different sources of power to produce electricity that they do not control. In addition to natural gas, wind generation requires wind which is not always available. And solar powered generation requires sunlight which is limited by cloud cover.

[15] *See CPS Energy*, 671 S.W.3d at 627.

"balance [the] competing factors apart from the common law."[16] Our conclusion is mandated by the separation of powers provision in our state constitution. *See* TEX. CONST. art. II, § 1. We must respect the Legislature's policy choices in enacting the current statutory framework for the electricity marketplace in Texas. Indeed, the core responsibility of our judicial branch of government is to interpret and apply the law consistently and predictably based on precedent, not to create it by judicial fiat. *Id.*; *see also Mouton v. Hous. Indep. Sch. Dist.*, No. 01-22-00205-CV, 2023 WL 4065602, at \*4 (Tex. App.—Houston [1st Dist.] June 20, 2023, pet. denied) (mem. op.). As an intermediate appellate court, we are particularly cognizant of these principles. *See Emscor Mfg. Inc. v. Alliance Ins. Grp.*, 879 S.W.2d 894, 910 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("It is not for an intermediate appellate court to create new causes of action.")

We therefore decline to create a new negligence-based duty on the wholesale power generators to continuously generate electricity for the retail customers in these proceedings. To the extent that the MDL pretrial court recognized and

---

[16]     *See Hous. Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 590 (Tex. 2023); *see, e.g.*, *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 714–15 (Tex. 2003) (declining to impose duty after "[a]pplying the *Phillips* risk/utility factors" because, in part, "comprehensive statutory and regulatory scheme" reduces risk of harm); *see J.P. Morgan Chase Bank v. Tex. Cont. Carpet, Inc.*, 302 S.W.3d 515, 535 (Tex. App.—Austin 2009, no pet.) (noting reluctance as intermediate court in recognizing new common-law duty with no existence in established law); *Nichols v. McKinney*, 553 S.W.3d 523, 528–29 (Tex. App.—Waco 2018, pet. denied) (declining invitation to impose new duty).

imposed such a new duty on the wholesale power generators, it clearly abused its discretion. Accordingly, we hold, for all of these reasons, that the MDL pretrial court clearly abused its discretion in denying this aspect of the wholesale power generators' Rule 91a motions and in not dismissing the retail customers' claims for negligence and assertions for negligent nuisance because they have no basis in law or fact as alleged.[17]

### Negligent Undertaking

In their second issue, the wholesale power generators argue that the retail customers' claims for negligent undertaking, which are pled in the alternative to negligence, also have no basis in law or fact because they "all involve purported failures to take various reliability measures."

The retail customers pleaded that the "Power Generator Defendants are liable to Plaintiffs, as consumers of the ERCOT grid, for their negligent performance of multiple voluntary undertakings." The retail customers then generally alleged that "[e]ach Power Generator Defendant undertook, either

---

[17] Because the retail customers' negligence-based claims fail on the threshold element of legal duty, it is unnecessary for us to address the other elements of negligence or their assertion of negligent nuisance. *See* TEX. R. APP. P. 47.1; *Nichols*, 553 S.W.3d at 532 (negligent nuisance fails in absence of legal duty). For the same reason, it is also unnecessary for us to address the retail customers' claim for gross negligence because, without a legal duty, the claim of gross negligence also has no basis in law or fact as alleged. *See RT Realty, L.P. v. Tex. Util. Elec. Co.*, 181 S.W.3d 905, 915 (Tex. App.—Dallas 2006, no pet.) ("Without a duty, there can be no negligence and no gross negligence."); *see also* TEX. R. CIV. P. 91a; TEX. R. APP. P. 47.1.

gratuitously or for consideration, to render services to Plaintiffs, which each Power Generator Defendant recognized or should have recognized as necessary for the protection of the Plaintiffs and their property."

After that, the retail customers pleaded a series of alleged undertakings by the wholesale power generators that can be summarized as follows: (1) undertaking to winterize and maintain its equipment; (2) providing generating resources to the grid for its registered rated load; (3) securing adequate fuel supply and choosing to source critical natural gas supplies; (4) generating into the grid when instructed to come online by ERCOT; (5) hiring and/or staffing an adequate amount of workers before and during Winter Storm Uri to ensure against generator outages and derates, as well as to ensure the power generating facility and equipment was operating at maximum generation capacity; (6) ensuring that its natural gas suppliers' were exempted from ordered blackouts by filing appropriate forms and/or taking other necessary or reasonable actions; and (7) warning plaintiffs and/or ERCOT prior to Winter Storm Uri about the likelihood of outages and derates in its equipment and facilities.

Our supreme court has recently explained that, "[u]nder Texas law, a defendant who undertakes to render services that it knows or should know are necessary for the protection of the other's person or things must generally exercise reasonable care in performing the undertaking." *First Reserve*, 671 S.W.3d at 660

(internal quotations omitted). "The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist." *Id.* (quoting *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013)).

The supreme court in *First Reserve* also importantly emphasized that "[this] duty is only implicated when the complained-of undertaking is an affirmative course of action; liability for negligent undertaking cannot be predicated on an omission." *Id.* (quoting *Elephant Ins.*, 644 S.W.3d at 152 & n. 80 ("[N]ot giving a safety warning is an omission, not an undertaking.")).

Here, essentially every omission pleaded by the retail customers to support their negligence cause of action is also alleged granularly as an affirmative undertaking to support their negligent-undertaking claim. It is settled that a party may plead multiple allegations in the alternative against a defendant, and they may even conflict. *See Low v. Henry*, 221 S.W.3d 609, 615 (Tex. 2007); *see also* TEX. R. CIV. P. 48. But Rule 48 does not permit a party to plead "in the alternative" a claim that has no basis in law or fact. *See Low*, 221 S.W.3d at 615. "That is simply not permitted by Texas law." *Id.* And artful pleading does not change the true nature and gravamen of such claims. *See In re Breviloba, LLC*, 650 S.W.3d 508, 512 (Tex. 2022) (orig. proceeding); *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010).

By initially pleading their negligent undertaking allegations as negligent omissions, the retail customers have acknowledged that their complained-of undertakings are not affirmative courses of action—and their artful pleading cannot recast those alleged omissions to be otherwise. *See Breviloba*, 650 S.W.3d at 512; *Yamada*, 335 S.W.3d at 196. Because the retail customers rely on purported omissions and failures to act to support their negligent-undertaking claims, they have not made factual allegations constituting a cause of action for negligent undertaking against the wholesale power generators with a basis in law. *See First Reserve*, 671 S.W.3d at 660, 663; *see also Garcia v. Kellogg Brown & Root Servs., Inc.*, No. 01-19-00319-CV, 2020 WL 3820426, at *10 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.) ("[F]ailures to act do not create a negligent-undertaking duty.").

The retail customers also argue that the wholesale power generators' action in generating electricity for the grid can be an affirmative course of action to support their negligent-undertaking claim.

As detailed above, the retail customers pleaded that the wholesale power generators failed to continuously provide electricity to them during Winter Storm Uri due to various purported omissions and failures to act (i.e., failures to winterize, failures to source adequate fuel, and failures to adequately staff). They also pleaded that the wholesale power generators "undertook, either gratuitously or

29

for consideration, to render services to Plaintiffs." But the retail customers did not plead that the complained-of undertaking by the wholesale power generators was the production of electricity during Winter Storm Uri. Indeed, such an allegation would be nonsensical. *See First Reserve*, 671 S.W.3d at 660 ("[L]iability for negligent undertaking cannot be predicated on an omission."); *Garcia*, 2020 WL 3820426, at *10 ("[F]ailures to act do not create a negligent-undertaking duty.").

Nevertheless, the retail customers argue that their general assertion that "[e]ach Power Generator failed to exercise reasonable care while rendering such services" is enough to bridge the substantive gap for their negligent-undertaking claims. Under the current statutory framework, the only service that wholesale power generators can provide is the generation of electricity that is sold to retail electric providers. *See* TEX. UTIL. CODE § 31.002(10)(A). And the wholesale power generators can have no direct relationship with any retail customer. *Id.* The retail customers must purchase their electricity through separate contracts with a retail electric provider. *Id*. § 31.002(17).

As a result, this argument by the retail customers is plainly based on the wholesale power generators agreements with retail electric providers to generate and sell electricity. *See id*. § 31.002(10)(A). According to the retail customers, the contractual obligations owed by wholesale power generators to the retail electric

30

providers can spring into a broad negligent undertaking duty owed by wholesale power generators to all retail customers to continuously produce electricity.

But the retail customers have not directed us to any Texas authority, and we are aware of none, that transforms the contractual duties owed by wholesale power generators to the retail electric providers under the current statutory framework into tort duties owed by the wholesale power generators to the third-party retail customers.[18] And the retail customers have not pleaded the existence of any special relationship or any third party beneficiary status conferred to them from the agreements between the wholesale power generators and the retail electric providers.

Accordingly, this argument by the retail customers is simply a bridge too far. We therefore conclude that the retail customers' negligent undertaking against the wholesale power generators also has no basis in law or fact as alleged and that the trial court clearly abused its discretion in denying the Rule 91a motions on this claim.[19]

---

[18] *See, e.g.*, *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494–95 (Tex. 1991) (claim for negligence could not be based on allegation that party failed to adequately perform contract—such claim sounded in contract, not tort); *Kuentz v. Cole Sys. Grp., Inc.*, 541 S.W.3d 208, 219 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (contractual obligations owed by pre-employment background screening company to car dealership client for background screening services did not impose generalized tort duty owed to third-party victim of criminal act).

[19] In light of concluding that the negligence and negligent-undertaking claims have no basis in law or fact, it is unnecessary to address substantively whether the

## Adequate Remedy by Appeal

Having concluded that the pretrial court abused its discretion in failing to dismiss the retail customers' claims for negligence, gross negligence, negligent undertaking, and for nuisance, under Rule 91a because they have no basis in law under the facts alleged, we now turn to the second requirement for mandamus relief—whether the wholesale power generators have an adequate remedy by appeal. *See Essex*, 450 S.W.3d at 528.

"The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments." *Id*. (citing *Prudential*, 148 S.W.3d at 136). In balancing these interests, the Texas Supreme Court has explained that "mandamus relief is appropriate to 'spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.'" *In re John G. & Marie Stella Kenedy Mem'l Found*., 315 S.W.3d 519, 523 (Tex. 2010) (orig. proceeding) (quoting *Prudential*, 148 S.W.3d

---

pretrial court properly denied the Rule 91a motions on the retail customers' remaining assertions of nuisance. *See* TEX. R. APP. P. 47.1. As our supreme court has instructed, nuisance is not a claim or cause of action—but a type of legal injury. *See Crosstex*, 505 S.W.3d at 588, 594–95. Because the four bellwether petitions asserting nuisance lack any surviving claim or cause of action against the wholesale power generators, all of the assertions of nuisance against them (including for negligent nuisance discussed above), likewise fails, as a matter of law. *See Bolton v. Fisher*, 528 S.W.3d 770, 778 (Tex. App.—Texarkana 2017, pet. denied) (concluding that trial court properly granted summary judgment on nuisance when plaintiff's petition did not include cause of action); *Amini v. Spicewood Springs Animal Hosp., LLC*, No. 03-18-00272-CV, 2019 WL 5793115, at *10 (Tex. App.—Austin Nov. 7, 2019, no pet.) (mem. op.).

32

at 136).  When a trial court abuses its discretion in denying a Rule 91a motion, this test is satisfied and mandamus relief is appropriate. *See Farmers*, 621 S.W.3d at 266; *In re Hous. Specialty Ins. Co.*, 569 S.W.3d 138, 142 (Tex. 2019) (orig. proceeding).

Accordingly, in light of our holdings above that the retail customers' pleadings allege causes of actions that have no basis in law or fact and should have been dismissed under Rule 91a, we further conclude that mandamus relief is appropriate here to spare the parties and the public the time and money spent on fatally flawed proceedings. *See Essex*, 450 S.W.3d at 528.

## Conclusion

We conditionally grant mandamus relief.  We direct the respondent to grant the wholesale power generators' Rule 91a motions to dismiss the retail customers' claims for negligence, gross negligence, negligent undertaking, and the assertions of nuisance in these five bellwether petitions.  Our writ will issue only if the respondent fails to comply in accordance with this opinion.

Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Landau and Hightower.